```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
JEANNE LOTURCO,                          :
                                         :
                        Plaintiff,       :    00 Civ. 8052 (DLC)
                                         :
             -v-                         :    OPINION AND ORDER
                                         :
JO ANNE BARNHART, Commissioner of        :
Social Security,                         :
                                         :
                        Defendant.       :
                                         :
-----------------------------------------X
```

Appearances:

For Plaintiff:

David MacRae Wagner
130 North Main Street, Suite 202
New City, New York 10956

For Defendant:

David N. Kelley
United States Attorney
John E. Gura, Jr.
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007


DENISE COTE, District Judge:

On October 16, 1997, Jeanne Loturco ("Loturco"), filed this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits. Loturco asserts that she was totally disabled for two years as a result of a car accident in which she suffered whiplash. The Commissioner and plaintiff cross-moved for a judgment on the pleadings. The motions principally address whether the appropriate weight was given to the opinions of treating

physicians. For the reasons that follow, Loturco's motion is denied, and the Government's cross-motion is granted.

**BACKGROUND**

The following facts are taken from the administrative record.

Medical History

On September 27, 1996, Loturco got into a car accident and was subsequently taken to the Nyack Hospital emergency room for medical assistance.[1] Loturco was examined by Dr. Neal Kane ("Dr. Kane"). She complained of back pain, shoulder pains, a mild occipital headache, and some numbness in her arms. The majority of discomfort came from the left side of her body. Dr. Kane's impression was that Loturco did not appear to be in great pain and that the impact of being rear-ended in the accident caused a cervical, thoracic and lumbar strain, but not a fracture. Dr. Kane was confident Loturco's minor pain would be temporary. She was discharged the same day with instructions to take Tylenol and to go for further testing.

The following day Loturco went to Arden Hospital, as recommended, to have more tests done to examine her neck. The x-rays revealed that there was no fracture of the cervical vertebrae. The attending physician also diagnosed a cervical

---

[1] Loturco, at the time of her disability insurance benefits application, was forty-one years of age. She was a high-school graduate and had completed a two-year program to become a licensed practical nurse. Her nursing job required over six hours of walking each day and lifting over one hundred pounds. During the period of her alleged disability, Loturco acknowledges that she drove herself to her doctors appointments, cooked, read, and did needle work.

2

strain and told Loturco to rest, wear a cervical collar for support, use warm soaks, and take Tylenol #3 and Motrin. A follow up with an oral surgeon was also suggested.

On September 30, Loturco went to her primary care physician, Dr. John Carey ("Dr. Carey"), complaining of neck and shoulder pain and a tingling sensation in her fingers. Dr. Carey conducted an examination and determined she suffered from a cervical strain and spasm, and whiplash syndrome resulting from the car accident. Dr. Carey prescribed Flexeril and Vicodin, and told Loturco to undergo an MRI. At this time, Dr. Carey also referred her to several specialists.

As instructed by Dr. Carey, Loturco had an MRI taken on October 1, which revealed "a right of midline disc herniation at C6/7 encroaching on the anterior subarachnoid space but not touching the ventral border of the cord." A slight disc bulge at C5/6 appeared in the MRI, but no other problems were detected.

In addition to the MRI, Loturco underwent an electrodiagnostic study on November 19. The electromyography ("EMG") revealed she had normal motor and sensory capabilities. The test also showed an irritability of the C5 muscular which "may be suggestive of a cervical radiculopathy."

The first recommended specialist Loturco visited was Dr. Jeffery Schnapper ("Dr. Schnapper"), a chiropractor. Dr. Schnapper agreed to treat Loturco two to three times per week for her symptoms of headaches and pains in her neck, lower back, jaw, arm, and leg.

On February 19, 1997, Loturco met with Dr. Ira Neustadt ("Dr.

Neustadt"), the recommended neurologist. The examination revealed that Loturco had a "primarily residual myofascial type pain with residual cervical and shoulder girdle strain." The conclusion was based on the fact that Loturco's motor strength was rated a five plus on a scale of zero to five, with five being the capacity of normal movement. She reacted well to a pinprick test, and she retained the ability to sit, walk, and move around with minimal pain. Dr. Neustadt emphasized the importance of reassuring the patient that "she will get better," and that conservative measures of treatment such as ice, moist heat, massage, and gentle physical therapy were the most appropriate to remedy her slight decreased range of neck motion. Occasional use of non-steroidal anti-inflammatory agents such as Relafen, combined with Zantac or Cytotec was also recommended. Dr. Neustadt believed Loturco could gradually return to work if she continued to apply the above conservative measures each night when she got home.

On February 25, Loturco visited her primary dentist, Dr. Stanko. Loturco complained of tightness in her jaw and frequent headaches. Upon conclusion of the examination, Dr. Stanko diagnosed her with capsulitis of the right and left temporomandibular joint ("TMJ"), retrodiscal synovitis of the right TMJ, myalgia of masticatory and cervical muscles, cervical dysfunction, and tension-type headache. Treatment for this condition ranged from seven to twelve months.

On March 5, 1997, Loturco was referred by Dr. Schnapper to Dr. Richard Semble ("Dr. Semble"), an orthopedist. Loturco again explained her medical history and symptoms of neck and lower back

4

pain, and numbness in her fingers.  Dr. Semble examined her cervical spine and found that her extension was slightly limited, but that the more prevalent problem was the restriction on her right rotation.  Her rotation of the shoulders was limited to one hundred-sixty degrees, which appeared to Dr. Semble to be caused by the pain coming from the cervical area.  Loturco was diagnosed with chronic cervical strain and recommended trigger point injections because her symptoms seemed to respond positively to that form of treatment.  In addition, continued chiropractic treatment was recommended.

Between May 23, and October 14, Loturco received thirty-five treatments of massage therapy for her whiplash symptoms.  Loturco initially spoke positively about her massage therapy treatment administered by Michael Kelly ("Kelly"), saying she was surprised at the amount of relief she felt.  Although on June 6 Loturco described the improvement as only "surface", and stated that the deep musculature remained in spasm, causing continued tightness in her neck, jaw, and lower back, she later reported on June 18 to Dr. Semble that the massages were helping.

During the fall of 1997, Loturco applied for disability insurance benefits.  As part of the Commissioner's review of her application, each treating physician was requested to fill out a report concerning her condition.  They were also asked to submit any relevant medical history.

On October 29, Dr. Semble submitted his report which described Loturco's seven months of treatment.  His medical notes from a visit in August 1997, indicated that Loturco was still in

pain despite being treated by both the chiropractor and massage therapist on a regular basis. Consequently, Dr. Semble instructed her to continue treatment because he found that she was still disabled and unable to engage in activities such as house cleaning. Dr. Semble's October 29 report sent to the Commissioner stated that Loturco "sustained a causally related cervical herniated disc for which she had persisted symptoms despite prolonged chiropractic and massage therapy as well as injectional therapy and medication." Similar to the other forms of treatment, the trigger point injections were not as successful as he would have liked because they did not offer her any long term relief. Dr. Semble's final diagnosis for the Commissioner was that Loturco's symptoms were permanent and that she had permanent limitations on her ability to do her normal work. Continued treatment of chiropractic, massage therapy, injectional treatment and even the possibility of surgery was recommended.

On October 30, Dr. Carey submitted his report to the Commissioner, diagnosing Loturco with "a cervical strain with spasm and TMJ status-post a motor vehicle accident." In response to the question of whether Loturco was capable of work-related physical activities, he wrote that he was "unable to make a determination," and deferred to "the specialist" to answer the question.

On November 5, Dr. Schnapper reported that Loturco was incapable of bending, sitting or standing for extended periods. According to Dr. Schnapper, Loturco could not pull or push over ten pounds or lift over five pounds.

6

After the Commissioner received the reports from Loturco's physicians, several consulting physicians examined Loturco at the request of the Department of Social Security. On November 19, 1997, Loturco was examined by Dr. Michael Kreitzer ("Dr. Kreitzer"), a consulting neurologist. After reviewing Loturco's medical history, Dr. Kreitzer believed that Loturco suffered from "post vehicular multitrauma syndrome." He reported, however, "It is my feeling that neurologically the patient fails to demonstrate any residua on clinical, neurophysiological or neuroradiolgical boundaries and I must state that the patient has in my impression, no findings to indicate that there is a neurological deficit and no disability." Therefore, Dr. Kreitzer found that Loturco did not need neurological treatment.

On November 26, Loturco met with Dr. Mohammed Khattak ("Dr. Khattak"), who conducted an orthopedic examination that covered Loturco's cervical spine, upper extremities, lumbar spine, and lower extremities. In regards to her cervical spine, Dr. Khattak determined the curvature of Loturco's spine was normal, there was no spasm, Loturco had good range of motion, and her muscle strength was normal. Loturco's upper extremities retained a full range of motion in the shoulders, elbows, forearms, wrists and fingers, allowing her to make a fist. She also had a full range of motion in her hips, knees and ankles. Dr. Khattak diagnosed Loturco with arthritis of the cervical spine, status-post whiplash, disc herniation at C6-7 level, and possible cervical radiculopathy and lumbar strain. His prognosis was that Loturco would eventually improve and in the meantime, she had the capacity

7

to sit, bend, stand, walk, lift, and carry.  Furthermore, she had the ability to push and pull without assistance from a device.

That same day, Loturco also got an x-ray of her cervical spine at the IMA Disability Services office.  The Radiology report showed a "straightening of the cervical lordotic curve consistent with muscle spasm."

Approximately nine days later, a second EMG was performed on Loturco's upper extremities.  The test results were "consistent with bilateral C7 radiculopathy and neurogenic dysfunction of the cervical paraspinal muscles at C7, primarily on the right side.  There [was] no electrical evidence of peripheral neuropathy or other focal neuropathy involving any of the upper extremities' nerves tested."

On December 12, a New York state agency assessment was conducted by Dr. Alan Auerbach ("Dr. Auerbach") to determine whether she had the ability to perform work-related activities.  Based on all of the evidence in the file, Dr. Auerbach determined Loturco was capable of occasionally lifting and/or carrying up to twenty pounds, and frequently lifting ten pounds.  She could sit, stand or walk during the required six to eight hour workday and had the unlimited ability to push or pull.  Dr. Auerbach took into consideration Loturco's age, and the level of activity she sustained after the motor vehicle accident.

On January 9, 1998, Loturco was sent to see Dr. Howard Kirschner ("Dr. Kirschner"), a consulting dentist.  Dr. Kirschner's report to the Commissioner strongly opposed the diagnosis of Dr. Stanko, which he referred to as "nonsense."  Dr.

8

Kirschner found that Loturco's jaw did not shift out of alignment and that she sustained no direct or indirect trauma to her TM joints in the course of the accident." Loturco was capable of bringing her back teeth together while chewing, a movement which would be impossible if she was suffering from TMJ. In Dr. Kirschner's opinion, Loturco's lack of improvement from her alleged symptoms was an indication that her claim was either "fallacious or not treated appropriately." Dr. Kirschner's conclusion was in part based on Loturco's refusal to move her jaw appropriately while he was attempting to take measurements, but then, in her "attempt to produce the joint sound, she moved enthusiastically and fully." Furthermore, Loturco appeared uncomfortable wearing her mouthpiece, and her speech had not adapted to wearing the appliance. It was also noted that the mouthpiece looked "very new." Dr. Kirschner enthusiastically rejected Dr. Stanko's opinion and questioned the truthfulness of Loturco's alleged pain. In response to this report, Dr. Stanko reiterated his position in a letter to Loturco's attorney, stating the need for continued treatment for her chronic condition of joint pain in her jaw.

On March 9, Dr. Carey declined to respond to the Commissioner's second request for his diagnosis on Loturco's functional capacity, particularly with respect to her ability to work. He wrote in the report to "refer to orthopedist," which he earlier identified as Dr. Semble.

On August 31, Loturco had a final related MRI. The report stated that "at the C5-6 level again noted [was] a very small,

slightly to the right of midline disc bulge. There is no evidence of disc herniation at this level. At the C6-7 level the disc herniation noted on the prior examination is no longer present. No abnormality is seen at this level at this time."

Loturco chose this day as the end point of her disability. On December 4, Dr. Semble found that Loturco had improved and had a full range of motion.

Application and Hearing History

Jeanne Loturco, filed an application for disability insurance benefits under Sections 216(1) and 223 of the Social Security Act, claiming she was disabled for two years -- from September 27, 1996 through August 31, 1998 -- due to injuries resulting from an automobile accident. The Commissioner denied her application as well as a request for reconsideration. Upon Loturco's request, a hearing was held on March 2, 1999 before Administrative Law Judge ("ALJ") Frank Borda. The ALJ denied Loturco's request on June 9, 1999, finding Loturco was capable of performing light work activity. The Appeals Council denied Loturco's request for a review of the decision. Loturco then commenced a civil action. On June 4, 2001, with consent of the parties, the ALJ decision was remanded, pursuant to sentence six of 42 U.S.C. § 405(g), for further proceedings. The Commissioner's decision was subsequently vacated by the Appeals Council and remanded to the ALJ.

On May 29, 2002, the ALJ held a supplemental hearing. At the hearing, Loturco was represented by counsel and testified about her inability to work because her hands felt numb and she had pain

in her back, neck, and jaw as a result of a motor vehicle accident. Loturco claimed the pain hindered her ability to sit, stand, walk, and lift. On June 13, the ALJ found for various reasons that Loturco was not disabled as defined in the Social Security Act. First, Loturco's allegations regarding her physical limitations were not completely credible, and second, she maintained the "residual functional capacity to sit, stand and walk as needed as well as lift objects weighing up to twenty pounds" during the relevant two year period. Therefore the ALJ found Loturco was capable of performing a full range of light work.

Loturco appealed to the Appeals Council, contending the ALJ made the same mistake that he made in his previous decision by disregarding the objective medical evidence on record and failing to give adequate weight to the treating physicians' findings. The Appeals Council decided not to assume jurisdiction over this matter. The Council supported the ALJ's overall assessment of the evidence and determined it to be the final decision of the Commissioner because plaintiff provided no basis for change. Loturco subsequently commenced this action, seeking review of the ALJ's determination that she was not disabled from September 27, 1996 through August 31, 1998.

## DISCUSSION

In reviewing the decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision unless it is not supported by substantial evidence or is based on an error of law. Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 1998). Substantial evidence in this context means "more than a scintilla. It means relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 n.2 (2d Cir. 2004) (citation omitted). It is not the function of the reviewing court to determine de novo whether a claimant was disabled. Curry, 209 F.3d at 122. Furthermore "it is the function of the agency, and not this court, to weigh the conflicting evidence in the record." Clark v. Commissioner of Social Security, 143 F.3d 115, 118 (2d Cir. 1998). It is well-settled that the ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony." Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983); Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (the ALJ's credibility determination is subject to deference).

A finding of disability will be made if the applicant can demonstrate the "[i]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute additionally requires that the applicant's impairment be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).
The disability must be a result of physical or psychological
abnormalities that are "demonstrated by medically acceptable
clinical and laboratory diagnostic techniques." 42 U.S.C. §
432(d)(3).

A five-step process is used by the Commissioner and the ALJ
to assess an applicant's disability claim. See 20 C.F.R. §
404.1520. The Second Circuit has summarized the procedure as
follows:

> First, the [Commissioner] considers whether the
> claimant is currently engaged in substantial gainful
> activity. If he is not, the [Commissioner] next
> considers whether the claimant has a "severe
> impairment" [that] significantly limits his physical or
> mental ability to do basic work activities. If the
> claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the
> claimant has an impairment . . . listed in Appendix 1
> of the regulations ["Appendix"]. If the claimant has
> such an impairment, the [Commissioner] will consider
> him disabled without considering vocational factors
> such as age, education, and work experience. . . .
> Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual
> functional capacity to perform his past work. Finally,
> if the claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other
> work [that] the claimant could perform.

Curry, 209 F.3d at 122 (citation omitted).

Determining whether the claimant can perform other work
requires first determining whether the applicant retains the
functional capacity for work-related activities. If the
applicant is subject only to exertional,[2] or strength

---

[2] Exertional and non-exertional limitations are defined as follows:

An exertional limitation is a limitation or restriction

13

limitations, the ALJ then uses the medical-vocational guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2 to cross-reference on a grid the applicant's residual capacity with his age, education, and work experience.  The grid then yields a determination of whether there is work the applicant could perform in the national economy.  Rosa, 168 F.3d at 78; see also Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

The burden to prove the requirements of the first four steps is on the claimant, but at step five, the burden shifts to the Commissioner.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). In employing the five-step process, the Commissioner must consider the following four factors: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (citation omitted).

The ALJ first determined that Loturco had not engaged in substantial, gainful activity during the period in question from September 27, 1996 through August 31, 1998.  Next, the ALJ found that the medical evidence established Loturco had cervical and

---

      imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling).  A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citation omitted).

jaw impairments that imposed limitations on her ability to perform basic work related functions.[3] Third, the ALJ correctly found that the medical documentation did not indicate the existence of any abnormalities listed in the Appendix. Fourth, the ALJ found that Loturco did not retain the residual functional capacity to perform the heavy lifting required in her past work as a licenced practicing nurse. The ALJ did find that Loturco remained able to perform light work, including the ability to lift light objects up to twenty pounds, and was able to sit, stand, and walk as needed throughout an eight-hour workday. He found that Loturco's ability to perform light work was supported by her sustained level of daily activity, such as cooking meals, driving distances of up to fifty-five miles, shopping, and regularly socializing with family members. Fifth, considering Loturco's age, education, work experience and residual functional capacity, the ALJ determined that there was alterative work Loturco could perform in the national economy during the relevant time period. The ALJ found the Commissioner met the burden of showing other work possibilities under Loturco's impairments.

The Commissioner's denial of Loturco's disability benefits application during the relevant time period was supported by substantial evidence and did not contain legal error. The limitations resulting from Loturco's spinal injury paled in comparison to her residual functional capacity. Substantial

---

[3] A severe impairment is considered "any impairment or combination of impairments which significantly limits the physical or mental ability to perform basic work activities. See 20 C.F.R. § 404.1508.

evidence belies Loturco's claim that her pain disabled her for approximately twenty-two months, as reports from Dr. Kane, Dr. Semble, Dr. Kirschner, Dr. Neustadt, and Kelly indicate that her complaints and her pain abated over time.  The diagnostic MRI and EMG tests revealed that Loturco had only slight abnormalities, and that these abnormalities would not deny her the ability to do light work.  For example, the tests revealed Loturco had a normal capacity of movement and good motor strength.  Furthermore, both the treating and consulting physicians decided that conservative methods of treatment were the most appropriate for Loturco's condition.  Such treatment included wearing a mouth piece for jaw discomfort, and taking Tylenol for back pain.  Dr. Neustadt recommended conservative topical treatments and physical therapy in conjunction with returning to work.  Based on the medical facts and subjective evidence of the claimant, as well as the diagnoses of several doctors, including Dr. Kreitzer, Dr. Khattack, and Dr. Auerbach, Loturco maintained the capacity to sit, bend, stand, walk, lift and carry, or push and pull as necessary for light work.  Indeed, doctors explicitly noted that Loturco was not disabled during the time in question and that there was no indication that her performance of light work would impair the healing process.

Loturco argues that the ALJ's June 13, 2002 decision ("ALJ Decision") should be reversed because the ALJ improperly gave controlling weight to the consulting physicians' opinions, rather

than her treating physicians, Dr. Carey and Dr. Semble.[4]  The treating physician rule provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2).  If the ALJ does not give treating sources controlling weight, five factors must be applied to determine the weight of the opinion.  The factors are:

> (1) the frequency of examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  See also 20 C.F.R. § 404.1527(d)(2).

The parties do not dispute the ALJ's conclusion that Dr. Carey and Dr. Semble were "treating physicians."[5]  See 20 C.F.R.

---

[4] The medical opinion of Dr. Schnapper was properly disregarded by the ALJ because a chiropractor is not an acceptable medical source whose opinion may receive controlling weight.  See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).

[5] Loturco claims the ALJ failed to consider factors such as the length and extent of treatment.  The evidence indicates, however, that the ALJ did look at the factors and liberally applied the definition of "treating source" to Dr. Semble despite

17

§ 404.1502. Moreover, despite her emphasis on a few comments by Dr. Stanko and Dr. Neustadt, Loturco admits that those doctors do not meet the "requirements of length and frequency of treatment"[6] to be considered treating physicians.

The ALJ found the treating physicians' opinions were "vague and inconsistent with the objective medical evidence." As noted in the ALJ Decision, Dr. Carey's October 30, 1997 report to the Commissioner stated that he could not make a determination on

---

the fact that he did not treat Loturco for a ten-month period in 1998.

[6] A treating source is defined as the claimant's

> own physician, psychologist, or other acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an <u>ongoing treatment relationship</u> with [claimant]. Generally, [the Social Security Administration] will consider that [claimant has] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [claimant] see[s], or [has] seen, the source with <u>a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [claimant's] medical condition(s)</u>. [The Social Security Administration] may consider an acceptable medical source who has treated or evaluated [claimant] only a few times or only after long intervals (e.g., twice a year) to be [claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [claimant's] condition(s).

20 C.F.R. § 404.1502 (emphasis supplied). A nontreating source is defined by the Social Security Administration as a

> physician, psychologist, or other acceptable medical source who has examined [claimant] but <u>does not have, or did not have, an ongoing treatment relationship</u> with [claimant]. The term includes an acceptable medical source who is a consultative examiner for [the Social Security Administration], when the consultative examiner is not your treating source.

20 C.F.R. § 404.1502 (emphasis supplied). <u>See also</u> 20 C.F.R. § 404.1527.

Loturco's ability to conduct work related activities, and that the determination should be reserved for a specialist. Therefore, Dr. Carey did not provide an independent medical opinion to which "controlling weight" would be assigned under the treating physician rule. The opinion of Dr. Semble, who opined that Loturco's symptoms were "permanent," and that she had "permanent limitations in her ability to do her normal work," was not consistent with the objective medical evidence or other physicians' opinions. See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). Even so, when parsed, Dr. Semble's conclusion is merely that Loturco could not perform her "normal work" of a nurse; he did not opine that she could not do any work. Thus, even if "controlling weight" were assigned to Dr. Semble's opinion under the treating physician rule, it would not alter the outcome of this case because it is not inconsistent with a finding that Loturco could perform light work.

Loturco's remaining arguments are inapposite. Loturco claims that Dr. Stanko's and Dr. Neustadt's opinions should have been giving controlling weight, but fails to articulate any legal basis for assigning such weight to the opinions of consulting physicians. In any event, Dr. Stanko did not conclude that Loturco was unable to perform alternative work, and Dr. Neustadt's opinion only further supports the Commissioner's position. Loturco also claims that the ALJ did not consider evidence consistent with the opinions of treating physicians, such as an MRI showing a herniated disc. This evidence was contradicted both by objective medical evidence of an earlier CT

19

scan and a subsequent MRI showing no herniation, as well as multiple physicians' opinions suggesting Loturco could perform light work, including those of Drs. Bostic, Neustadt, and Khattack.

## CONCLUSION

Loturco's motion for a judgment on the pleadings is denied. The Government's cross-motion for the judgment on the pleadings is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York
May 5, 2005

DENISE COTE
United States District Judge